IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| YASMIN ATKINS | * | |
| | * | |
| v. | * | Civil No. JFM-15-2198 |
| | * | |
| SYLVIA M. BURWELL | * | |
| | ****** | |

## MEMORANDUM

Plaintiff Yasmin Atkins files suit against defendant Sylvia M. Burwell, U.S. Secretary of Health and Human Services, in her official capacity (the "government"), seeking damages and injunctive relief for violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, relating to alleged sexual harassment she suffered while she worked at the National Institutes of Health ("NIH") as a contractor. Now pending is the government's motion to dismiss or, in the alternative, for summary judgment.[1] The parties have fully briefed the motion, and no oral argument is necessary. *See* Local Rules 105.6. For the reasons below, summary judgment is granted in favor of the government.

## BACKGROUND

Plaintiff Yasmin Atkins is an African American female who is a resident of Prince George's County, Maryland. (ECF No. 1, ¶ 1). In October 2011, Global Solutions Network hired Atkins to work on a contract basis for the U.S. government as a Procurement Technician. (ECF No. 1, ¶ 15). Atkins was assigned to the Office of Acquisitions at the NIH's National

---

[1] The government moves to strike portions of Atkins's affidavit attached to her opposition. (ECF No. 32). Because I grant the government's motion to dismiss or, in the alternative, for summary judgment even after considering Atkins's affidavit, I deny the government's motion to strike as moot. *See Hartford Ins. Co. of Midwest v. Am. Automatic Sprinkler Sys., Inc.*, 23 F. Supp. 2d 623, 630 n. 13 (D. Md. 1998), *aff'd*, 201 F.3d 538 (4th Cir. 2000).

1

Institute of Allergy and Infectious Diseases ("NIAID"), Division of Microbiology Infectious Diseases Research Contract Branch A ("DMIDRCB-A"),[2] located in Bethesda, Maryland. (ECF No. 16, Ex. 1, p. 1–2). At the time of Atkins's assignment, the branch chief of DMIDRCB-A was Richard Hartmann, a white male. Atkins's job duties there included assisting with administrative tasks associated with the procurement of goods and services. (ECF No. 1, ¶ 17). According to Atkins, she received satisfactory and favorable work evaluations. *Id.* at ¶ 19; (ECF No. 16, Ex. 1, pp. 195–96).

Atkins alleges that from October 2011 to September 2013, Hartmann sexually harassed her. (ECF No. 16, Ex. 1, p. 5). She testified, by affidavit, that Hartmann invited her on his boat two times, one invitation was extended only to her and one was an email invitation to her and other members of the office. (ECF No. 16, Ex. 1, p. 133). Both times, she declined his invitation. On another occasion, Hartmann offered Atkins a pocketbook, which she returned to him, citing concerns about how her boyfriend would perceive the gift.[3] *Id.* In response, Hartmann stated that if Atkins's boyfriend "was that insecure then he doesn't need to be with you." *Id.* Hartmann subsequently gave the pocketbook to another member of the office. According to Atkins, Hartmann would also visit her desk and drop off magazines at least three times a month. *Id.* at 134. On another occasion, Atkins alleges that Hartmann told her that her zipper was down. *Id.* at 133–34. And, Atkins alleges, Hartmann gave her at least one "flush-on hug" and tried to hug her several other times. *Id.* at 134. Furthermore, Atkins alleges that Hartmann would make comments about her shoe choice and, when she wore heels, he would compare her shoes with another female in her office. *Id.* at 133. Lastly, Atkins alleges that

---

[2] DMIDRCB-A was one of several branches in the Office of Acquisitions at the NIAID.
[3] Hartmann states that he buys box lots regularly and that he gives the unwanted items from those lots as gifts to his coworkers. (ECF No. 16, Ex. 1, pp. 143–44).

2

Hartmann stared at her chest and her body on multiple occasions. *Id.* In response to his alleged harassment, Atkins tried to moderate her dress and avoid contact with Hartmann. (ECF No. 26, Ex. 1, pp. 5–6). She also disengaged with coworkers and acted aloof to avoid Hartmann and conversations about Hartmann. *Id.*

In September 2012, Atkins applied for one of three fulltime Contract Specialist positions in the Office of Acquisitions. *Id.* at 25. Prior to the interview, Hartmann told Atkins that while "she was a good employee and did excellent work, he would hire someone with a law degree over her." *Id.* After interviewing for the position, Atkins was not selected.

In March 2013, the NIH posted a vacancy announcement for multiple fulltime Contract Specialist positions in the Office of Acquisitions. (ECF No. 16, Ex. 1, pp. 53–91). The job listing covered a total of nine Contract Specialist openings in four branches within the Office of Acquisitions. Each branch was responsible for selecting its own Contract Specialists. Atkins applied to the listing and the Office of Acquisitions deemed her eligible. *Id.* at 94. The Office then selected her for one of approximately 25 interviews. *Id.* at 169. Prior to her interview, Hartmann told Atkins that he thought she had an "excellent chance" at the job. *Id.* at 25. Atkins was interviewed by a panel that included other branch chiefs in the Office of Acquisitions, but not Hartmann. *Id.* at 137. According to Atkins's interviewers, she did not excel in her interview. One interviewer, David Lisle, a branch chief, said that Atkins was not "able to communicate and elaborate effectively enough to our questions that I could feel comfortable enough to select her for the position" and that he felt, during the interview, "she was not effectively demonstrating her abilities." *Id.* at 169. A second interviewer, Michael Finn, another branch chief, said that Atkins "didn't do very well in the interview," noting that she "seemed very nervous and was relatively quiet and her responses were very short." *Id.* at 186. He concluded that the applicants

who he selected for his branch "interviewed better." *Id.* A third branch chief, Dante Stumpo, observed that Atkins "did not do as well answering the technical questions and did not do well with the technical aspects of the position overall." *Id.* at Ex. 2, p. 12. The Director of the Office of Acquisitions, Charles Grewe, stated that his "understanding was that she just didn't do as well in the interviews as other candidates." *Id.* at Ex. 1, p. 164. A number of other officials involved in the hiring process expressed similar sentiments. *Id.* at Ex. 1, pp. 182–83; 190–91 (describing problems with Atkins's work). Ultimately, none of the branches within the Office of Acquisitions selected Atkins.

On August 7, 2013, after learning that she had not been selected for the openings, Atkins contacted an Equal Employment Opportunity Office and alleged that Hartmann had sexually harassed her and discriminated against her on the basis of sex, race, and color. *Id.* at 23. She filed an official Equal Employment Opportunity Commission ("EEOC") complaint on September 23. *Id.* at 39. She put forth three discrimination claims: a sexual and non-sexual harassment claim against Hartmann, a claim for discriminatory non-selection with respect to the September 2012 Contract Specialist openings, and a claim for discriminatory non-selection with respect to the March 2013 Contract Specialist openings. *Id.* at 18–22. The EEO Office issued a partial acceptance of two out of her three claims, leaving out the September 2012 non-selection claim as untimely. After an investigation, the Department of Health and Human Services determined that Hartmann did not discriminate against or sexually harass Atkins. Accordingly, no punitive action was taken against Hartmann and Atkins received no monetary or injunctive relief. The agency did, however, direct Hartmann to attend training and work with an executive coach on his leadership skills. *Id.* at 49–50. After the investigation, Atkins left her contractor position, and she is currently employed at the Department of Homeland Security.

Atkins now files a one-count complaint against the government for violations of Title VII, alleging claims for *quid pro quo* sexual harassment and sexual harassment hostile work environment.[4]

## STANDARD

The government styles its motion as one to dismiss under Rule 12(b)(6) and 12(b)(1), or, in the alternative, for summary judgment under Rule 56. Under Rule 12(d), a court may, in its discretion, consider matters outside the pleadings and convert a motion to dismiss into one for summary judgment. *See Strothers v. City of Laurel, Md.*, 118 F. Supp. 3d 852, 860 (D. Md. 2015). Generally, however, motions for summary judgment are to be decided only after the parties have had an opportunity for discovery. *See Tinch v. United States*, 189 F. Supp. 2d 313, 315 (D. Md. 2002). But this general rule does not apply when the nonmoving party does not oppose conversion of a motion to dismiss to a motion for summary judgment "on the grounds that more time [is] needed for discovery or moved for a continuance to permit discovery." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996). To oppose conversion, a nonmovant "must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, 'for specified reasons, it cannot present facts essential to justify its opposition' without needed discovery." *Hart v. Lew*, 973 F. Supp. 2d 561, 573 (D. Md. 2013) (citing Fed. R. Civ. P. 56(d)). A failure to file such a document is "itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Evans*, 80 F.3d at 961 (citing *Paddington*

---

[4] In her opposition, Atkins states that she has a third claim for "tangible employment action." ECF No. 25, p. 3). But this not an independent cause of action. Rather, it is an element of a *quid pro quo* claim. *See Moser v. MCC Outdoor, L.L.C.*, 256 F. App'x 634, 642 (4th Cir. 2007) ("[T]o establish quid pro quo liability, a plaintiff must prove that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands.") (internal quotation marks and citations omitted); *cf.* 29 C.F.R. § 1604.11(a) (describing *quid pro quo* and hostile work environment as the two Title VII causes of action for sexual harassment).

5

*Partners v. Bouchard*, 34 F.3d 1132, 1137 (2d Cir. 1994)). Plaintiff's failure to file a Rule 56(d) document can, however, be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court served as the functional equivalent of an affidavit." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244–45 (4th Cir. 2002) (internal quotation marks and citations omitted).

Here, although she opposes conversion of the government's motion, Atkins does not file a Rule 56(d) document and further, submits her own pleadings outside the record, (*see* ECF No. 26, Exs. 1, 2). Atkins also fails to file a document outlining what discovery she believes is needed. And, despite her opposition to conversion of the government's motion, Atkins contends that she has generated a genuine dispute of material fact based on the existing record. (*See, e.g.*, ECF No. 26, Ex. 2). Therefore, because Atkins has failed to file a Rule 56(d) document or the functional equivalent of one, and contests the merits of the government's motion, I consider the government's filing as one for summary judgment.

Under Rule 56(a), a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247 (1986). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Accordingly, when reviewing a motion for summary judgment, the court must look at facts and inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

And while the movant bears the initial burden of demonstrating an absence of a genuine dispute of material fact, trial courts have an obligation to prevent "factually unsupported claims and defenses from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (citing *Celotex*, 477 U.S. at 323–24). Therefore, in response to a properly supported motion for summary judgment, the non-moving party must, by affidavit or other evidentiary showing, set out specific facts showing a genuine issue for trial. *Anderson*, 477 U.S. at 248–49; *see also Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 160 (1970). Finally, a court should also enter summary judgment when a party fails to make a showing sufficient to establish elements essential to a party's case, and on which the party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322.

## ANALYSIS

The government argues that it is entitled to summary judgment on Atkins's claims because the government was not her employer, Atkins's 2012 non-selection claim is untimely, Atkins did not administratively exhaust her Title VII *quid pro quo* sexual harassment claim, and Atkins fails to create a genuine dispute of material fact as to her *quid pro quo* sexual harassment or sexual harassment hostile work environment claims. For her part, Atkins argues that the government acted as her joint employer, she administratively exhausted both her claims, and that she has sufficiently demonstrated a *quid pro quo* sexual harassment and hostile work environment claim. Without confronting the thorny and fact-bound issue of whether the government acted as Atkins's employer, *see Murphy-Taylor v. Hofmann*, 968 F. Supp. 2d 693, 727 (D. Md. 2013), I hold that Atkins did not exhaust her administrative remedies as to her 2012 *quid pro quo* claim and that Atkins has not presented a genuine dispute of material fact as to

either her *quid pro quo* claim or hostile work environment claim. Therefore, I grant the government's motion for summary judgment.

I. **Atkins's 2012 *Quid Pro Quo* Claim is Untimely**

To start, because Atkins did not exhaust her administrative remedies as to her November 2012 non-selection claim, the government is entitled to summary judgment on that claim. Before asserting a Title VII claim in court, a plaintiff must timely exhaust her administrative remedies. *Balas v. Huntington Ingalls Industries, Inc.*, 711 F.3d 401, 406 (4th Cir. 2013). According to EEOC regulations, an "aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1). A plaintiff's "failure to make this contact within the 45-day window is tantamount to failure to timely exhaust all administrative remedies." *Blount v. Dep't of Health & Human Servs.*, 400 F. Supp. 2d 838, 841 (D. Md. 2004), *aff'd sub nom. Blount v. Thompson*, 122 F. App'x 64 (4th Cir. 2005).

It is uncontroverted here that Atkins did not make contact with an EEO counselor regarding her November 2012 *quid pro quo* claim until August 7, 2013, well over the 45-day deadline. (*See* ECF No. 16, Ex. 1, p. 23). Thus, it is clear that Atkins did not exhaust her administrative remedies as her November 2012 non-selection and I grant the government's motion with regard to this claim.[5]

II. **Atkins Has Not Created a Genuine Dispute of Fact as to Her Remaining 2013 *Quid Pro Quo* Non-Selection Claim**

---

[5] Atkins argues that the 2012 non-selection was part of a continuing violation. (ECF No. 26, p. 20). Her argument is meritless. As this Court has held, a "denial of a promotion" constitutes a "discrete act . . . which should have caused [plaintiff] to be aware of her obligation to contact an EEO counselor." *Blount*, 400 F. Supp. 2d at 842. Similarly, Atkins's 2012 non-selection was a discrete act that started the 45-day clock in which Atkins could contact an EEO counselor.

8

Atkins's failure to exhaust her administrative remedies as to her November 2012 non-selection leaves a single non-selection *quid pro quo* claim stemming from the government's decision not to hire her as a Contract Specialist in 2013. The government argues that it is entitled to summary judgment on this claim for two reasons: one, Atkins failed to exhaust her administrative remedies by failing to spell out her *quid pro quo* claim in her original EEOC charge, and two, Atkins does not demonstrate a prima facie case. Although I find that Atkins has exhausted her administrative remedies, she has not adequately shown a prima facie case. Thus, I grant the government's motion for summary judgment as to this claim.

First, Atkins has exhausted her administrative remedies. The Fourth Circuit has held that "[o]nly those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996) (internal citations omitted). Claims outside these enumerated categories are deemed unexhausted and are subject to dismissal. *See Bryant v. Bell Atl. Maryland, Inc.*, 288 F.3d 124, 133 (4th Cir. 2002).

Here, while Atkins did not specifically allege, in legal nomenclature, a *quid pro quo* claim in her EEOC charge, she did state a claim in that document reasonably related to a *quid pro quo* claim. Namely, in her charge, she stated that "it appears that because I have ignored/turned down Mr. Hartmann's countless advances he chose to retaliate by not hiring me." (ECF No. 16, Ex. 1, p. 19). This is plainly the basis for a *quid pro quo* claim. Additionally, there is evidence that the EEOC investigation was reasonably related to a *quid pro quo* claim. During the investigation, EEO investigators explored the idea that Atkins was not hired to a fulltime position as a result of her refusing to engage in a *quid pro quo* relationship. EEO

investigators asked Atkins if she felt she was not selected for a fulltime position because she did not accept Hartmann's alleged sexual advances. (ECF No. 16, Ex. 1, pp. 138–39). Therefore, because Atkins's 2013 *quid pro quo* claim is reasonably related to the original EEOC charge and investigation, I determine that she has exhausted her administrative remedies as to the claim.

Atkins's 2013 *quid pro quo* claim, however, fails because she does not generate a genuine dispute of material fact. "*Quid pro quo* sexual harassment occurs when an employer conditions, explicitly or implicitly, the receipt of a job benefit or a tangible job detriment on the employee's acceptance or rejection of sexual advances." *Williams v. Silver Spring Volunteer Fire Dep't*, 86 F. Supp. 3d 398, 416 (D. Md. 2015) (internal quotation marks and citations omitted). To prove a prima facie case of *quid pro quo* discrimination, a plaintiff must show five elements: membership in a protected group; unwelcome sexual harassment; sexual harassment based on sex; that her reaction to the harassment affected "*tangible aspects* of the employee's compensation, terms, conditions, or privileges of employment;" and that the employer knew or should have known of the harassment but took no remedial action. *Okoli v. City Of Baltimore*, 648 F.3d 216, 222 (4th Cir. 2011) (internal citations omitted) (emphasis in original). With respect to the fourth element, the "acceptance or rejection of the harassment must be an express or implied condition to the receipt of a job benefit or cause of a tangible job detriment to create liability," and the plaintiff must have been otherwise qualified to receive the job benefit. *Id.*

Here, Atkins has not shown the fourth element of a prima facie claim. She proffers no credible evidence that her 2013 non-selection was in any way related to her decision to turn down Hartmann's alleged sexual advances. Her own admissions belie the existence of a *quid pro quo* relationship or demands. As she herself testified during the EEO investigation, she did not believe that her non-selection was a result of her denying Hartmann's alleged sexual

advances. (ECF No. 16, Ex. 1, 138–39). Rather, she alleged that Hartmann did not select her because of her race and color. *Id.* at 138. Further, she admits in the instant litigation that she did not think a *quid pro quo* relationship or demands existed until *after* her non-selection. (*See* ECF No. 26, p. 19). These statements are by themselves sufficient to doom her *quid pro quo* claim. If Atkins herself did not believe a *quid pro quo* relationship or demands existed, no reasonable juror could believe her claim now. Her statement in a subsequent affidavit—filed for the purposes of the instant litigation—contradicting her previous declaration and stating that Hartmann "had used his power in the hiring process in an attempt to exchange sex for selection to a permanent job," (ECF No. 26, Ex. 1, ¶ 26), is insufficient to defeat summary judgment. As the Supreme Court has held, "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999). Atkins makes no attempt to explain the inconsistencies between her two affidavits and thus, her latest statement lacks credibility.

Moreover, Atkins's case is further weakened by the lack of evidence that Hartmann influenced her non-selection. Atkins's theory of her *quid pro quo* case is that she did not get a fulltime position because Hartmann convinced other employees involved in the selection process that he was going to hire Atkins, causing them to omit her from their pool of eligible candidates. (ECF No. 1, ¶¶ 31–32). But this argument is unsubstantiated—Atkins can cite to no evidence showing that Hartmann tried to influence Atkins's prospects among other branch chiefs.[6]

---

[6] Atkins correctly states that Hartmann had the power to hire her for Contract Specialist openings in his own branch. But this fact, without evidence showing that he did not hire her because she refused his alleged sexual advances, is insufficient to support a *quid pro quo* claim.

11

Indeed, the record undercuts Atkins's argument. In an affidavit stemming from the EEOC investigation, the branch chiefs' supervisor Charles Grewe noted that during the hiring process, when other branch leaders were discussing Atkins's qualifications, Hartmann, rather than try to influence the selection process, "deferred to his two team leaders." (ECF No. 16, Ex. 1, p. 165). Similarly, at least five other officials who participated in hiring stated that Hartmann did not tell them he was going to hire Atkins. *Id.* at 169, 173, 178, 183, 186–87. Those officials indicated that they considered Atkins's application on its merits but chose other candidates instead. Accordingly, there is nothing in the record that supports Atkins's claim that Hartmann actively plotted to prevent other branch chiefs from hiring her.[7]

Viewed in the aggregate, the evidence shows that no reasonable juror could believe that Hartmann subjected Atkins to a *quid pro quo* relationship and thus, I grant summary judgment for the government on Atkins's *quid pro quo* claim.[8]

### III. Atkins Fails to Generate a Genuine Dispute of Material Fact as to Her Hostile Work Environment Sexual Harassment Claim

---

[7] Atkins points to branch chief Michael Finn's affidavit as evidence that Hartmann tried to block her selection. In response to a question about whether Hartmann had ever indicated he was going to hire Atkins, Finn responded:

> I know she was not his first choice for sure. I'm not sure because it was a long time ago, but I think there was some soul-searching or thinking process that if the others he wanted to select didn't work out, would they consider hiring her?

(ECF No. 16, Ex. 1, p. 187). It is unclear, however, in what way this statement supports Atkins's case. In fact, the statement undermines her allegation that Hartmann tricked other branch chiefs into thinking he was going to hire her. And further, by Finn's telling, Hartmann was actually advocating *for* Atkins's hiring by asking other branch chiefs if they would consider hiring her.

[8] Because Atkins fails to prove the fourth element of a *quid pro quo* claim, I find it unnecessary to reach the question of whether Atkins's non-selection constituted an adverse employment action.

Atkins also asserts a Title VII claim for hostile work environment sexual harassment. The government argues that Atkins has not shown that Hartmann's conduct created an abusive work environment and that his conduct was imputable to the government. I agree as to the first point and grant summary judgment for the government on this basis.

To establish a prima facie Title VII claim for hostile work environment sexual harassment, a plaintiff "must prove that the offending conduct (1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003). As to the third requirement, a plaintiff must show that her work environment was both objectively and subjectively abusive; in other words, the work environment "must be perceived by the victim as hostile or abusive, and that perception must be reasonable." *Ziskie v. Mineta*, 547 F.3d 220, 227 (4th Cir. 2008). The Supreme Court has noted that "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)) (internal citations omitted). The wrongdoer's actions must go beyond "simple teasing . . . offhand comments, and isolated incidents (unless extremely serious)." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). To determine the viability of a plaintiff's hostile work environment claim, a court can look to the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. In evaluating a work environment, the Fourth Circuit has

held that courts in the circuit should consider all circumstances, including "evidence about how other employees were treated in that same workplace." *Ziskie*, 547 F.3d at 225.

Atkins cannot meet the third element of a hostile work environment claim. In examining all of the circumstances surrounding Atkins's work environment, a reasonable juror could not believe that she was subject to severe or pervasive conduct sufficient to alter her conditions of employment and create a hostile work environment. Construing the facts in the light most favorable to Atkins, Hartmann's allegedly offensive conduct over the span of Atkins's two-year tenure at DMIDRCB-A included: a gift of a pocketbook later given to another employee, two invitations to Hartmann's boat (one of which was extended to the rest of the office), hugs, comments and jokes about Atkins's high-heeled shoes and a dress, one instance in which Hartmann told Atkins to pull up her zipper, placing magazines on her desk three times a month, and staring at Atkins's body. (*See* ECF No. 16, Ex. 1, pp. 133–34). Moreover, Atkins alleges that Hartmann hugged another female in the office, who also felt uncomfortable. *Id.* at p. 134. These incidents, however, do not rise to the level of severity necessary to prove a hostile work environment sexual harassment claim. That is, much of Hartmann's conduct—hugs, jokes about clothing, gifting magazines and a pocketbook, and social invitations—were within the outer bounds of acceptability in an ordinary workplace. At worst, they were within the "the normal run of aggravations that are part of holding a job." *Ziskie*, 547 F.3d at 228. And the remaining incidents, which include Hartmann staring at Atkins's body and inappropriate comments about her dress, were not so beyond the pale that they "present[ed] serious impediments" to Atkins's ability to do her job and advance her career. *Id.* at 229. These incidents are, in the parlance of the case law, more akin to offensive utterances than conduct that is physically threatening or humiliating. When considering each incident together—including those which would not

normally be considered offensive conduct—a reasonable juror would not be able to say that Hartmann's conduct was so severe or pervasive as to affect Atkins's conditions of employment and create a hostile work environment. Likewise, Atkins also fails to show that Hartmann's alleged sexual harassment was part of a pattern or practice of sexual harassment against other women or minorities in the office. Even taking Atkins's allegation that Hartmann made another woman uncomfortable by hugging her as true (ECF No. 16, Ex. 1, p. 134), this single isolated incident is inadequate to show a hostile work environment.[9] This is, of course, not to say that Hartmann's actions were not inappropriate or offensive. But inappropriate behavior, without more, is insufficient to rise to the level necessary to demonstrate a hostile work environment sexual harassment claim. *See Akwei v. Burwell*, No. DKC-15-1095, 2016 WL 3440125, at *11 (D. Md. June 23, 2016) (isolated derogatory comments about an employee's accent were not sufficiently severe and pervasive); *Freire v. Keystone Title Settlement Servs., Inc.*, No. AW-08-2976, 2009 WL 5217033, at *5 (D. Md. Dec. 30, 2009), *aff'd*, 389 F. App'x 306 (4th Cir. 2010) (compliments about plaintiff's breasts while hugging her and comments like "you look hot and sexy" were not sufficiently severe and pervasive); *Sraver v. Surgical Monitoring Servs., Inc.*, No. CCB-05-1331, 2006 WL 2190727, at *1, *4 (D. Md. July 27, 2006) (sexually suggestive questions and derogatory sexual remarks such as "You'll get a bonus when I get a blowjob" were not sufficiently severe and persuasive). As the Fourth Circuit has observed, the line between a viable and infirm Title VII hostile work environment sexual harassment claim is "those situations that indeed present serious impediments to minority and female workers and those situations when human nature simply is not at its best." *Ziskie*, 547 F.3d at 229. This case falls

---

[9] Atkins further alleges that Hartmann sexually harassed other women in the office with "impunity." (ECF No. 26, p. 30). This explosive allegation, however, lacks credibility because Atkins provides no evidentiary support for it.

15

squarely in the latter category. Accordingly, because Atkins fails to proffer evidence sufficiently proving the third element of a hostile work environment sexual harassment claim, I grant summary judgment for the government.

## CONCLUSION

For the aforementioned reasons, I grant the government's motion for summary judgment. A separate order follows.

Date  August 17, 2016

J. Frederick Motz
United States District Judge